NOTICE OF MOTION AND MOTION
TO COMPEL DISCOVERY AND TRANSCRIPTS
("SEALED") #2:14-CR-00027-NDF-2 (USDC/DWY)

Margin Notes [sic]:

TO: Office of Chief Judge (duly credentialed)
U.S. District Court
2120 Capitol Avenue, 2nd Floor
Cheyenne 82001
Wyoming, USA

DATE: June 4, 2014 A.D.

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2014 JUN 16 PM 12:45
STEPHAN HARRIS, CLERK
CHEYENNE

Greetings Your Honor,

[28 USC 1345] Now comes the United States ex rel. Paul Andrew Mitchell, B.A., M.S., Citizen of Washington State and Private [18 USC 1964] Attorney General, to move this honorable Court for an ORDER compelling disclosure of all discovery documentation and all grand jury transcripts to the Undersigned [28 USC 1654] personally under 28 U.S.C. 1654, for all of the following meritorious reasons:

[OUSA/DWY, see Docket records] (1) the Office of U.S. Attorney has already been ordered, once before, to produce timely discovery documents and grand jury transcripts for examination by Relator;

[(Hardlee?)] (2) so-called "stand-by counsel" Mark C. Hardee totally abandoned Relator [6th Amend.] between the two (2) hearings on 3/21/2014 and 6/3/2014, in violation of the Sixth Amend.;

-1 of 4- (3) a formal Complaint is now pending

-1 of 4-

| | |
|---|---|
| cf. NOTICE OF TERMIN- ATION (filed) | against Mr. Hardie at the Wyoming State Bar, Board of Professional Responsibility, for abandonment and other related attorney malpractices; |
| | (4) a table of Delegations of Authority |
| "IRM" | in the IRS Internal Revenue Manual still shows awards of $25,000 CASH and up to $35,000 to the President, through |
| irs.gov/irm/ | Treasury"; on the Internet, see www.irs.gov/irm/. |
| | (5) the latter Performance Management |
| "PMRS" | and Recognition System ("PMRS") |
| i.e. "Kickback Racket" | was repealed by Act of Congress in 1993, 21 years ago as of 2014 A.D.; still "on the books"; |
| | (6) it now appears quite probable that the IRS continues to award Federal prosecutors $25,000 CASH for every "indictment" issued |
| cf. "RR1998" (112 Stat.) | by Federal grand juries against "tax protesters or any similar designation", and against State Citizens wrongly identified |
| see attached article: "Inside the DHS," Pgs. 2 of 6, 5 of 6 !! | as "sovereign citizens" and/or "extremists"[sic]. (7) Relator is an eyewitness to a written admission, on IRS letterhead, that no PMRS records exist because all such awards were paid in CASH; see FOIA Request; |
| felony tax evasion | (8) such CASH awards also raise the real possibility that recipients have failed to report same on their IRS Forms 1040 "U.S. Individual Income Tax Return(s)"; |

— 2 of 4 —

| | |
|---|---|
| felony perjury: 28 USC 1746(2) | (9) failing to report such CASH awards on their Forms 1040 also implicates all recipients in felony tax evasion and felony perjury; see IRC, subtitle F; (10) IRS Forms 1040 must be executed under penalty of perjury in conformity |
| 28 USC 1746(2) 28 USC 1345 cf. Preamble | to 28 U.S.C. 1746(2) i.e. within (inside) the "United States" and without (outside) the United States of America (50 States of the Union); latter are NOT "Plaintiffs" in this case; (11) given the sheer volume of "indictments" |
| U.S. BOP | required to enlarge the Federal prison population to its current inflated size, it is also reasonable to suspect, and prove, that no grand juries were ever convened for many such "indictments," that is, the latter were merely "signed" by a |
| "Debra Halthus"? FRCrP Rule 7 | "FOREPERSON" and a "U.S. ATTORNEY" or "ASSISTANT U.S. ATTORNEY" under color of compliance with FRCrP Rule 7; (12) if no lawful grand jury was ever convened in the instant cases, that fact by itself would serve to explain the "government's" contempt of the previous discovery orders at (1) above i.e. there are no transcripts because there were |
| -3 of 4- | no grand jury hearings, in point of FACT. |

-3 of 4-

| | |
|---|---|
| see Brady v. Maryland re: Brady Hearing | (13) it necessarily follows that no exculpatory (favorable) evidence was, or ever could be, presented to a lawful grand jury in the instant cases, obviously if no such hearings were ever conducted; |
| 28 USC 1865 | (14) Relator has already demonstrated that the Federal Jury Selection and Service Act expressly discriminates against State Citizens a.k.a. Citizens of ONE OF the 50 States, |
| Pannill v. Roanoke; People v. De La Guerra; "The Federal Zone"!! | by requiring all Federal jurors to be federal citizens; cf. "Federal citizenship" in Black's Law Dictionary, Sixth Edition; |
| 28 USC 1865 | (15) a panel of federal citizens was not, and could not be, a lawful Federal grand jury in the instant cases, further proving that no valid "subpoenas" and no valid "indictments" could ever issue from any such panel(s), in points of Law and fact. |

REMEDY

This Court should ORDER the Office of the U.S. Attorney in Cheyenne to show cause why it should not be sanctioned for contempt of all prior discovery ORDERs.

Respectfully submitted,
Paul Andrew Mitchell, B.A., M.S. (chosen name)

| | |
|---|---|
| 28 USC 1654 18 USC 1964 UCC 1-308 28 USC 1861 -4 of 4- | Relator In Propria Persona, 28 U.S.C. 1654; Private Attorney General, 18 U.S.C. 1964 All Rights Reserved (cf. UCC 1-308, 28 U.S.C. 1861) |

-4 of 4-

*[Handwritten margin note, left side: "Incorporated by reference in MOTION TO COMPEL DISCOVERY AND TRANSCRIPTS (June 4, 2014 A.D.)"]*

Intelligence Report, Summer 2011, Issue Number: 142

# Inside the DHS: Former Top Analyst Says Agency Bowed to Political Pressure

*[Handwritten note: "File in: #2:14-CR-00027-NDF-2 ("SEALED")"]*

Share    Like    8+1    Email

Interview conducted by Heidi Beirich    *[handwritten: "? PM"]*

**Daryl Johnson** has been battling extremist groups for two decades. He got his start in the field in 1991, when he worked on counterterrorism for the U.S. Army. In 1999, Johnson left the Army for the Bureau of Alcohol, Tobacco and Firearms, where he was a subject-matter expert on violent antigovernment groups. In 2004, officials at the newly created Department of Homeland Security (DHS) approached Johnson to take a key post as the senior domestic terrorism analyst. He accepted and, for six years, Johnson led a team of experts on domestic extremist groups.

- Browse All Issues
- Subscribe to the Intelligence Report
- Law Enforcement Resources
- Donate

*[Handwritten: "See Pages 2 of 6, 5 & 6!"]*

While at DHS, Johnson and his team wrote the April 7, 2009 report, "Right-wing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment." The report, which was intended for law enforcement only, was quickly leaked and caused a firestorm among some on the political right who accused DHS of painting all kinds of conservatives as potential Timothy McVeighs. In fact, it had merely pointed out that some domestic extremists focused on single issues like immigration and abortion and also noted that extremists were interested in recruiting military veterans returning from Iraq and Afghanistan. Its analysis of the causes of the surge of right-wing radicalism — the election of the nation's first black president and the economy, among other things — still seems completely accurate and is in line with similar findings by the Southern Poverty Law Center. *[handwritten: "= Zionist bias, prejudice, hypocrisy PM"]*

But DHS ultimately reacted to criticism from conservative columnists and groups like the American Legion by withdrawing the report. (Ironically, given the criticism of his report, Johnson describes himself as a registered Republican who "personifies conservativism.") In the months following the leak, Johnson says in the interview below, DHS gutted its domestic terrorism analysis unit.

Events in the immediate aftermath of DHS' suppression of its report seemed clearly to exonerate its conclusions. In late May 2009, abortion provider George Tiller was shot and killed by an anti-abortion fanatic — just the kind of

Daryl Johnson   *[handwritten: "obese too? PM"]*

person the DHS report had warned of in one section. In June 2009, neo-Nazi James von Brunn killed a security guard at the U.S. Holocaust Memorial Museum in Washington, D.C., while trying to storm into the building. Many similar attacks and planned attacks by the radical right have followed, right up to the present day.

Since leaving DHS last year, Johnson has formed a company, DT Analytics, to consult and offer training

*on issues related to violent domestic extremism and homeland security. He also is writing a book that he hopes will set the record straight on what really happened at DHS as well as help state and local law enforcement officials better confront the continuing threat of domestic terrorism.*

**When did you become interested in domestic terrorism?**
Way back in 1983, when I was only 14 years old. At the time, the white supremacist terrorist group the Covenant, the Sword and the Arm of the Lord, or CSA, was generating a lot of media attention. I was fascinated by CSA and a little bit scared by it too. It made me curious to understand why people would quit jobs, leave their families and move to remote Arkansas to start arming themselves for Armageddon. I even sent a letter in 1986 to then-Sen. John Warner [R-VA], as part of my Eagle Scout requirements, that talked about the increasing terrorist activity abroad and I wondered, "How much longer will it take until terrorism arrives in the United States?" In the letter, I wrote, "If terrorism does come to the United States, which I think it will shortly, it will either be started or contributed by the militia." Nine years later, Timothy McVeigh, who was affiliated with the militia movement, blew up the Alfred P. Murrah Federal building in Oklahoma City, killing 168 people. Ultimately, I turned that interest into a career.

**How did your official work in this area begin?**
When I was with the U.S. Army as a civilian intelligence analyst in the years after the 1995 Oklahoma City bombing, we had a lot of militia cases involving threats to the military in U.S. These groups were stealing military materials, recruiting U.S. soldiers, conducting surveillance of armories, and plotting to attack bases. They thought the "New World Order" was staging its troops on our bases and that the Federal government was creating citizen detention camps using the U.S. military. They also claimed alleged black helicopter sightings. I remember learning that the Republic of Texas had conducted surveillance of military installations in Texas, that another militia group in Michigan had stockpiled illegal weapons and plotted to attack military bases in Battle Creek, and then there was the Ft. Hood plot, too. *[Editor's note: In 1997, two men, who were associated with the militia movement, were arrested. They had planned to attack Ft. Hood, near Killeen, Texas, and slaughter foreign troops which they wrongly believed were housed there, along with innocent civilians.]*

**What was your mission at DHS?**
DHS's mission was identified in the 2002 Homeland Security Act. Part of the department's responsibilities includes identifying and assessing possible terrorist threats to the homeland and notifying law enforcement officers of those threats. We looked at extremist groups who had histories of violent activities, but who might not necessarily be doing anything right now. We also studied radicalization: the process of adopting an extremist belief system and showing a willingness to use or facilitate violence to change the world. We wanted to know how a law-abiding person becomes radicalized to the point of being willing to hurt people. No one else was doing this work from a uniquely domestic, non-Islamic perspective.

**How did your unit work?**
I was the senior intelligence analyst for the domestic terrorism unit. I oversaw five analysts who worked directly for me, and we had support from other analysts outside our unit. Each person had a different account—the white supremacist movement, militias and (sovereign citizens,) single-issue extremists, and so on. We also had anarchists and leftwing terrorists as topics. There was an analyst who supported us through alternative analysis—that's where you think about the future and try to figure out what domestic terrorism will look like down the road. Another analyst conducted most of our Internet research. Three of my staff members were considered subject-matter experts. Combined, we had 50 years of experience in analyzing domestic extremism.



**What was it like day-to-day at DHS?**
We were responsible for providing answers to state and local law enforcement agencies. They would submit questions, and we would help out, usually by telling them what is happening throughout the country, identifying emerging trends and explaining the history, organization structure, capability and activities of extremist groups. The fusion centers would send in information, and we'd analyze it and respond. We had a monthly newsletter, and we wrote several assessments and reference aids that provided background information on extremist groups who had violent histories. Most valuable, I think, were the dozens of presentations we gave to state and local law enforcement agencies each year. We often received positive feedback and letters of appreciation from our stakeholders.

**How did your work with DHS differ from the FBI's?**
The FBI is the lead agency on terrorism, so no one else in the federal government has the resources they have. They have a core cadre of agents and analysts in D.C. devoted to this issue. DHS complemented the FBI counterterrorism mission. The FBI is a law enforcement agency, so they have rules and legal parameters in which they must operate. DHS was not constrained by these same rules because we were part of the intelligence community. We had a different set of rules to abide by. At the time, we had more latitude to look at extremist groups who talked about violence or who had histories of conducting violent acts, although not currently engaged in violence. And we were an alternate and sometimes dissenting voice to the FBI. This is an important aspect of intelligence work, because it prevents "group think" and biased analytical judgments by a single agency.

**Can you describe what led to the creation of the right-wing extremism report?**
Back in 2005, we were worried about the ELF [Earth Liberation Front, a leftwing extremist group] and ALF [Animal Liberation Front] because of their sabotage and arson activities. But in 2007, we started seeing a shift as right-wing extremism was becoming revitalized. We still had analysts covering animal rights extremism and eco-terrorism, but we began spending more time focused on white supremacists and militias.

The report evolved in a complicated way. It began after a phone call from the U.S. Capitol police in January 2007. They wanted help with then-Sen. Barack Obama's announcement of his candidacy for president. We monitored the Internet for about a month or so looking for threats to Obama. We didn't see anything threat-related, but I started thinking, "What if the U.S. elects a black president? What impact will this have on extremism in this country?" It seemed pretty clear to me that it would lead to a radicalization and recruitment boom by white supremacists, militias and other right-wing extremists, because this is what they fear the most—a black president, the ultimate symbol of a minority population's integration into U.S. society.

When Obama looked as though he was going to win the nomination [in August 2008], we started an outline. Between April and October 2008, we were immersed in collecting data. My team was still writing a draft of the report when <u>Janet Napolitano</u> became the <u>new DHS secretary in January 2009.</u> ✗

Three months into Obama's administration, Napolitano asked us four questions: Are we seeing a rise in domestic right-wing extremism? If so, is it related to the election of a black president? What are the chances of it escalating to violence? And what are we going to do about it?

At first, I thought I would do a Q&A for Napolitano, but given that we had a report in draft form, I was directed to write an assessment that would not only answer Napolitano's questions, but also help state and local police prepare for an anticipated change in the domestic threat environment.

**How did you feel about her appointment?** *Janet* *U.S. Attorney* ✗
We were actually somewhat optimistic and excited because <u>Napolitano was the former Arizona attorney</u> *NO!*
*NO!* <u>general.</u> She had been involved in the prosecution of Michael Fortier, who was part of the Oklahoma City bombing investigation of Timothy McVeigh and Terry Nichols. And she was also involved in the Viper Militia case back in 1996. *[Editor's note: Members of the militia were accused of surveilling Federal facilities in Phoenix as part of an alleged bombing plot. In the end, several were convicted of weapons charges.]* So, here we had a secretary with experience in working domestic terrorism cases. We thought we had a potential advocate and ally.

**Did your report generate controversy inside DHS?**
This is how it happened. I got a tasking from the secretary, which demanded a quick turnaround. We went through all the necessary coordination; many people reviewed the draft and made comments. Several people signed off on the report: two supervisors, the Office of General Counsel, multiple editors, etc. The Office of Privacy signed off, and the Office of Policy had no suggestions.

The secretary doesn't oversee agency reports. She couldn't do it, given the number of agencies generating multiple reports a day. As a result, heads of DHS' agencies have authority to review work, coordinate with other agencies, approve and disseminate reports.

✶ *See all VERIFIED CRIMINAL COMPLAINTS in: Arizona v. Mitchell, and Misconduct Complaint v. The late John M. Roll, USDC/Tucson*

One office raised issues — the Office of Civil Rights and Civil Liberties [CRCL]. At the time, we weren't required to give them the report, but my boss thought we should run it past them. They had edits, but the main issue related to the definition of right-wing extremism. That office wanted a narrow definition limited to violent groups and individuals. Our subject-matter experts and management felt the definition needed to be broader.

Under CRCL's definition, if you were in the Klan, burned crosses, had a terrorist in your house and donated money to groups advocating violence, you still would not qualify as a right-wing extremist. Our attorneys basically told them, "We appreciate your input, but we are approving the more broad definition." This ended up being a sore point with CRCL once the document was released.

### Did Napolitano know about the report?
Analysts generally have little interaction with the secretary. I know she was briefed on the report a few days before it went out. The day after it went out, I met with Napolitano to talk about the four questions she had asked. My division director thought we could answer the first three questions, but couldn't answer the last. So, we gave the last question to the FBI, and they came to the briefing.

The report had yet to be leaked. I gave Napolitano a summary of the report and gave her a map of where new militia extremist groups had recently organized. She held the report and nodded her head with agreement as I was talking. It was a cordial meeting. She listened and thanked us all, and she seemed pleased.

### Any idea who leaked it?
The report went to the fusion centers [joint federal, state and local terrorism task forces] and various law enforcement agencies. They, in turn, blasted it out to many more people. It's virtually impossible to know who leaked it, though I have some hunches. Obviously, the person who leaked the report didn't agree with it and had a political agenda.

### How did you react when the report came under attack?
It was an extremely frustrating time, to see conservatives and media folks taking the report out of context and misinterpreting it. [Conservative columnist] Michelle Malkin called it Obama's "hit job" to target conservatives and others said it called everyone "on the right" a terrorist.

They would have been shocked to know that I personify conservatism. I'm an Eagle Scout. I'm a registered Republican. I'm Mormon. In fact, I was helping the Boy Scouts with a fundraiser when I heard the report being attacked on the news.

### How were Malkin and other commentators wrong?
This report was not politically motivated. It was based on a phone call from the Capitol Police that got me thinking about what having a black president would mean to extremism in the U.S. We wanted to warn LEOs [law enforcement officials] about a growing threat.



"When the right-wing report was leaked and people politicized it, my management got scared and thought DHS would be scaled back. DHS stopped all of our work and instituted restrictive policies. Eventually, they ended up gutting my unit."

*obese too? answer: YES!*

Sad to say, we were right on this one. History has shown that. I'd also like people to know that we were not directing LEOs to do anything. We were prohibited from doing so. All we could do was say there is a

trend emerging, and if you have these folks in your jurisdiction, perhaps you should think about how you are using your resources. Malkin and others totally misconstrued this.

Others criticized the report's points as being obvious, meaning that the bad economy and Obama were fueling this resurgence. Nonetheless, we were the first ones in law enforcement to connect these dots and to write about them.

### What happened after the leak?
I got to the office, and there were lots of phone calls. Citizens were angry. People wanted to speak to DHS authorities. I was very distraught. I felt I could talk to my peers, but beyond that, I couldn't speak for myself. The public affairs office was doing all the PR and media response. We weren't consulted on anything. If I could have responded, I would have said this is why we wrote this. But the response DHS provided just fueled the public's speculation.

### What about Napolitano?
Napolitano initially supported the report. She issued an official press release [on April 14, 2009] that said DHS has the authority to look at all types of threats. And we need to be vigilant. It was very supportive and direct.

Unfortunately, not too many people listened, and they kept applying political pressure. She held a couple of press conferences, trying to put out that same message. And people just kept continuing the pressure, especially after Congress got involved. [Editor's note: For example, U.S. Rep. Pete Hoekstra (R-Mich.), then the ranking member of the Permanent Select Committee on Intelligence, wrote to Napolitano to complain about what he called "a shoddy, unsubstantiated, and potentially politicized work."]

I don't know whether her staff advised her to, but she eventually backtracked. The DHS press spokesman came up with this story that it was all unauthorized and orchestrated by a rogue group of analysts. DHS caved in.   *LIE?  PM*

### How did you feel?
I felt as if I had been betrayed. I had been the recipient of numerous awards at DHS. Our team was considered to be a very productive team that knew its customers. Our co-workers, field representatives and law enforcement counterparts respected us. Many thought we were doing great work.

### What ultimately happened?
Napolitano eventually told Congress that DHS was going to remove the report from its websites. Some of the people in the media assumed they were recalling the report. That never happened. There is actually a formal process involved when you want to rescind a report. The only reason you do so is if there was something erroneous in the document. Napolitano also told Congress that DHS was going to pull this report back and refashion it into a much more usable format. It never happened.

### Is it off the DHS website today?
Yes. It was removed from various law enforcement computer systems, and classified systems too. But they never sent out an official recall notice saying, "Hey, you need to destroy this document, it's erroneous."

### What happened to your DHS unit?
When the right-wing report was leaked and people politicized it, my management got scared and thought DHS would be scaled back. It created an environment where my analysts and I couldn't get our work done. DHS stopped all of our work and instituted restrictive policies. Eventually, they ended up gutting my unit. All of this happened within six to nine months after the furor over the report. Analysts then began leaving DHS. One analyst went to ICE [U.S. Immigration and Customs Enforcement], another to the FBI, a third went to the U.S. Marshals, and so on. There is just one person there today who is still a "domestic terrorism" analyst.

Since our report was leaked, DHS has not released a single report of its own on this topic. Not anything dealing with non-Islamic domestic extremism—whether it's anti-abortion extremists, white supremacists, "sovereign citizens," eco-terrorists, the whole gamut.

*→ see U.S. Supreme Court: "American People are sovereigns without subjects"*

**What do you think this means for our country's safety?**
We are more vulnerable. I mean, we lost five good analysts, four of them, including myself, very well-seasoned, considered experts in their topics. We obviously have this serious threat coming from Al Qaeda, or some other international terrorist group, which can result in a mass casualty-producing attack. But I feel that the government has a lot of good intelligence analysts focused on Al Qaeda and similar threats.

*[handwritten: FACT?]*

What worries me is the fact that our country is under attack from within, from our own radical citizenry. *[handwritten: ¿?]* There have been a lot of small-scale attacks lately, whether it's three mail bombs sent to U.S. government facilities in Maryland and D.C., or a backpack bomb placed near a [Martin Luther King Jr. Day] parade in Spokane, Wash., or two police officers gunned down at a traffic stop in West Memphis, Ark., [by antigovernment extremists in May 2010].

These incidents are starting to add up. Yet our legislators, politicians and national leaders don't appear too concerned about this. So, my greatest fear is that domestic extremists in this country will somehow become emboldened to the point of carrying out a mass-casualty attack, because they perceive that no one is being vigilant about the threat from within. That is what keeps me up at night.

© 2014. Southern Poverty Law Center.

---

\* Please contact U.S. Coast Guard ("USCG") Investigations at San Diego Harbor: Paul Andrew Mitchell assisted USCG there for ~7 YEARS with 91'/Pentagon research; identified foreign nationals smuggling high explosives into close proximity to the U.S. Navy Base at Coronado Island; and, reported rogue 20KT nuclear weapon reportedly hidden in aircraft carrier USS Midway, now a popular aircraft museum moored in San Diego Harbor adjacent to Navy Pier (civilian side). County HazMat was also notified in person by Undersigned, Paul Andrew Mitchell

MODELESKI, M.P. (given name)
#45396
S.B.C.D.C.
P.O. Box 130
Gering, Nebraska
[69341-0130]

Re:
#2:14-cr-00027-NDF-2

All Rights Reserved
(cf. UCC 1-308)

LEGAL MAIL

TO: Clerk of Court, Office of
U.S. District Court
2120 Capitol Ave., 2nd Floor
Cheyenne 82001
Wyoming, USA
    82001